STATE OF NORTH CAROLINA v. FRANK RAY CHANDLER

No. 343A93

(Filed 8 March 1996)

**1. Jury § 141 (NCI4th)— capital trial—jury selection—parole eligibility questions not permitted**

The trial court did not err by denying defendant's pretrial motion in a capital trial to conduct *voir dire* regarding prospective jurors' beliefs about parole eligibility. The decision of *Simmons v. South Carolina,* —— U.S.——, 129 L. Ed. 2d 133 is inapplicable when, as here, the defendant remains eligible for parole if given a life sentence.

**Am Jur 2d, Jury §§ 189, 205 et seq.**

2. **Burglary and Unlawful Breakings § 151 (NCI4th)— burglary—instructions—intent to commit attempted larceny—correction in supplemental instructions—no plain error**

The trial court did not commit plain error by originally instructing the jury that defendant could be found guilty of burglary if it found he entered the occupied dwelling with the intent to commit the offense of attempted larceny, a misdemeanor, rather than with the intent to commit larceny, a felony, where the court thereafter gave the jury supplemental instructions in which it replaced "attempted larceny" with "larceny" in describing the intent element of burglary; the verdict sheet stated that defendant must have intended to commit larceny in order for the jury to return a verdict of guilty; the trial court correctly defined the intent required for both larceny and attempted larceny in the original instructions, and the instructions made it clear that the intent required is the same; the jurors convicted defendant of the separate charge of attempted larceny, which means they concluded beyond a reasonable doubt that defendant intended to commit a larceny; and there was direct evidence presented at trial of defendant's intent sufficient to support a burglary conviction and no evidence to the contrary.

**Am Jur 2d, Burglary § 69.**

3. **Larceny § 52 (NCI4th)— attempted larceny—indictment—allegation of particular goods not required**

It is not necessary in an attempted larceny indictment to specify the particular goods and chattels the defendant intended to steal.

**Am Jur 2d, Larceny §§ 128 et seq.**

4. **Criminal Law § 1341 (NCI4th)— pecuniary gain aggravating circumstance—constitutionality of pattern instruction**

The pattern jury instruction on pecuniary gain is not unconstitutionally vague and overbroad.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like—post-*Gregg* cases. 66 ALR4th 417.**

**5. Criminal Law § 1341 (NCI4th)— conviction under felony murder rule—submission of pecuniary gain aggravating circumstance**

The trial court did not err in submitting the pecuniary gain aggravating circumstance after the jury failed to find defendant guilty of first-degree murder based on premeditation and deliberation but found him guilty under the felony murder rule where the State's evidence was that defendant's motive for breaking and entering the victim's home was to steal, and although the jury could find from the evidence that defendant did not intend to kill the victim when he struck her, it could also find that defendant's motive in striking her was pecuniary gain.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like—post-*Gregg* cases. 66 ALR4th 417.**

**6. Criminal Law § 1341 (NCI4th)— pecuniary gain aggravating circumstance—intent to steal—instructions—value in money not required**

The trial court did not err by failing to instruct the jury in a capital sentencing proceeding that it could find the pecuniary gain aggravating circumstance only if it found that defendant intended or expected to obtain money or some other thing which the defendant valued in money where defendant testified that he went to the victim's house to steal marijuana and a fellow inmate testified that defendant told him he intended to steal the victim's purse. The State's evidence showed that defendant broke into and entered the victim's house with the intent to steal, and whether defendant was looking for marijuana to satisfy his drug dependency or for the victim's purse was not relevant.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like—post-*Gregg* cases. 66 ALR4th 417.**

**7. Criminal Law § 1341 (NCI4th)— felony murder—burglary as underlying felony—pecuniary gain aggravating circumstance**

The trial court did not err in submitting the pecuniary gain circumstance to aggravate a felony murder for which burglary is the underlying felony since the circumstance that the capital felony was committed for pecuniary gain does not constitute an element of the offense.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like—post-*Gregg* cases. 66 ALR4th 417.**

**8. Criminal Law § 1358 (NCI4th)— capital sentencing—mental or emotional disturbance mitigating circumstance—voluntary alcohol use**

Defendant's alleged voluntary alcohol use on the night of a murder does not qualify as a mental or emotional disturbance for purposes of the mitigating circumstance set forth in N.C.G.S. § 15A-2000(f)(2).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Modern status of the rules as to voluntary intoxication as defense to criminal charge. 73 ALR3d 195.**

**9. Criminal Law § 455 (NCI4th)— capital sentencing—death penalty as deterrence—prosecutor's argument not improper**

The prosecutor did not improperly urge the jury in a capital sentencing proceeding to vote for the death penalty to deter the violence and crime that plagues our society by comments about the rights of the victim and the responsibilities of jurors. Furthermore, the prosecutor could properly argue for the death penalty because of its deterrent effect on the defendant personally.

**Am Jur 2d, Trial §§ 554, 572.**

**Propriety, under Federal Constitution, of evidence or argument concerning deterrent effect of death penalty. 78 ALR Fed. 553.**

**10. Criminal Law § 436 (NCI4th)— capital sentencing—prosecutor's closing argument—failure to tell what occurred—lack of remorse**

The prosecutor's comments in his jury argument in a capital sentencing proceeding regarding defendant's insincerity and lack of remorse shown by his failure to tell his version of what happened on the night of the crime until he testified were permissible inferences from the evidence and not improper.

**Am Jur 2d, Trial §§ 554, 572, 573.**

**11. Criminal Law § 452 (NCI4th)— capital sentencing—prosecutor's closing argument—comment on aggravating circumstance—no gross impropriety**

The prosecutor's closing argument in a capital sentencing proceeding about the legislature's provision of only one aggravating circumstance applicable to the facts of this case was not so grossly improper that the trial court should have intervened *ex mero motu.*

**Am Jur 2d, Trial §§ 554, 572, 573.**

**12. Criminal Law § 1373 (NCI4th)— death penalty not disproportionate**

A sentence of death imposed upon defendant for first-degree murder was not disproportionate where defendant was convicted under the felony murder rule, with first-degree burglary as the underlying felony; the jury found as the sole aggravating circumstance that the murder was committed for pecuniary gain; the jury rejected the three statutory mitigating circumstances submitted and found three nonstatutory mitigating circumstances; defendant admitted at trial that he killed the ninety-year-old victim; defendant broke into and entered the victim's home at night, seeking either marijuana or money; as defendant walked through the victim's house he heard the victim scream, turned, and struck the victim in the head with such force as to break her skull in two; defendant thereafter carried her to her bed, wiped his bloody hands on her stomach, removed her pajama bottoms and underpants, and then covered her up and searched the house for her purse; unable to find it, he returned to his aunt's house and went to sleep; after the murder defendant immediately began a failed attempt to establish an alibi, lied to the police, tried to convince his cousin to lie to the police, and tried to destroy his fingerprint

STATE v. CHANDLER

[342 N.C. 742 (1996)]

cards after the police obtained them; and defendant told a fellow inmate he would "play crazy" to try to avoid conviction.

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like—post-*Gregg* cases. 66 ALR4th 417.**

Justice ORR dissenting.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Freeman, J. on 20 July 1993 in Superior Court, Surry County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to his appeal of his convictions of first-degree burglary and attempted larceny was allowed on 5 April 1994. Heard in the Supreme Court 10 January 1995.

*Michael F. Easley, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General, and Linda M. Fox, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, for defendant-appellant.*

MITCHELL, Chief Justice.

This case arises out of the death of Doris Poore, a ninety-year-old widow who was killed during a burglary of her home on 11 December 1992.

Defendant was indicted for first-degree murder, first-degree burglary, attempted larceny, attempted first-degree rape, and attempted first-degree sexual offense. He was tried before a jury, which found him guilty of the first-degree murder of Doris Poore under the felony murder rule, with first-degree burglary as the underlying felony. The jury also found him guilty of attempted larceny, but not guilty of attempted first-degree rape or first-degree sexual offense. After a separate capital sentencing proceeding, the jury recommended and the trial court imposed a sentence of death for the first-degree murder conviction and a three-year prison sentence for the attempted larceny conviction.

The State presented evidence at trial tending to show that on 10 December 1992, Mrs. Poore talked by telephone with Grace Vaughn, a friend, until approximately 10:30 p.m. The next day at 8:00 a.m., Lea Quiros, the victim's housekeeper, arrived at Mrs. Poore's house and knocked on the front door. When Mrs. Poore did not answer the door, Mrs. Quiros attempted to call her on the telephone. Again, no one answered. Mrs. Quiros contacted Mr. Jack Leach, Mrs. Poore's son-in-law, who, on arrival, entered the house by the back door. Mr. Leach let Mrs. Quiros in the house. Mr. Leach found Mrs. Poore dead in her bed in a pool of blood.

Special Agent R.D. Melton of the SBI testified that during the investigation of Mrs. Poore's death, he observed that the screen door at the back of her house had been cut with two "L"-shaped cuts above the center support strut on the right side of the door where a latch was located. The screen was slightly pushed in. The wooden door was open, and the screws from the chain lock were pulled from the wall and left hanging on the door.

After entering Mrs. Poore's house, Melton found Mrs. Poore's glasses and hearing aids on the dining room table. Upon entering Mrs. Poore's bedroom, he found bed clothing on the bed, a sheet pulled up over the victim, and an area of pooled blood underneath her head. The victim was lying on the bed with her pajama top open and her body was nude from the waist down; smeared bloody fingerprints were on her abdomen. A pair of pajama bottoms and a pair of panties were wadded together at the foot of the bed between the victim's legs, but slightly beneath her right foot. He also noted that an electric heating pad was on the bed.

Dr. Gregory James Davis, a forensic pathologist, testified that Mrs. Poore died from a single "massive blow" to the head. The blow resulted in a hinge fracture to the scalp, which effectively caused the skull to snap in two resulting in extensive swelling and hemorrhaging of the brain. Mrs. Poore had numerous abrasions, lacerations, and bruises.

Special Agent Ricky Navarro, a latent evidence specialist with the SBI, testified that palm and fingerprints matching the defendant's were found on the wooden door leading into the kitchen.

Special Agent J.L. Eddins testified that after he took defendant's fingerprints, he asked defendant to sign a consent to search form. Defendant signed the fingerprint card, but refused to sign the other

related documents. After defendant asked to make a phone call, he proceeded to destroy all of the documents and the card.

Jeffrey Kyle Wilson, defendant's cellmate from January 1993 until April 1993, testified that while defendant was in jail, defendant asked him what he should do. Wilson told him to tell the truth so that he would not get the electric chair. Wilson said that defendant replied that "they" did not have the evidence to convict him. Then, defendant described how he had committed the murder and that as a defense, he planned to "play crazy."

Defendant took the stand as the only defense witness and testified that he left his aunt's house between midnight and 12:30 a.m. on 11 December 1992 and walked to the victim's house. After knocking on the window, back door, and garage door, and not getting an answer, he entered the house through the unlocked basement door. He proceeded up the stairs, cut the screen door with a pocketknife, and opened the back door leading to the kitchen. He testified that as he started to walk through the house, he saw something out of the corner of his eye. When he started to leave, somebody behind him screamed. He then turned and swung, making the victim fall against him. He testified that as Mrs. Poore was falling, he caught her; he then carried her to her bed, put her in the bed, and went to the bathroom to wash the blood off his hand. He saw Mrs. Poore's clothes at the front of the toilet, picked them up, put them next to her in her bed, and covered her up.

Defendant testified that he had not known who lived in the house, but thought that a man lived there because he had seen a blue pickup truck parked in front of the house before and had seen a man smoking "reefer" or marijuana there. Defendant testified that after he left the house, he washed his clothes and that he still had them. On cross-examination, defendant testified that after he killed Mrs. Poore, he did not look for the marijuana as he had originally planned.

[1] By his first assignment of error, defendant contends that the trial court erred by denying his pretrial motion to conduct *voir dire* regarding prospective jurors' beliefs about parole eligibility. This Court has consistently decided this issue against defendant. *State v. Powell*, 340 N.C. 674, 687-88, 459 S.E.2d 219, 225 (1995), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 64 U.S.L.W. 3467 (1996); *State v. Price*, 337 N.C. 756, 762-63, 448 S.E.2d 827, 831 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 224 (1995); *State v. Payne*, 337 N.C. 505, 516, 448

S.E.2d 93, 99 (1994), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 292 (1995). As we explained in *Payne,* the recent decision in *Simmons v. South Carolina,* —— U.S. ——, 129 L. Ed. 2d 133 (1994), does not affect our position on this issue when, as here, the defendant remains eligible for parole if given a life sentence. *Payne,* 337 N.C. at 516-17, 448 S.E.2d at 99-100. We continue to adhere to our prior rulings on this issue. This assignment of error is overruled.

**[2]** By his next assignment of error, defendant contends that the trial court erred by instructing the jury that defendant could be found guilty of burglary if it found he entered the occupied dwelling with the intent to commit the offense of attempted larceny, a misdemeanor, rather than with the intent to commit larceny, a felony. The trial court instructed the jury as to the first-degree burglary charge as follows:

> Now, the defendant has also been accused in another case of burglary in the first degree, which is the breaking and entering of an occupied dwelling house of another without his or her consent, in the nighttime, with the intent to commit either the felony of attempted first degree rape, felony of attempted sexual—first degree sexual offense, or the *felony of attempted larceny,* or the felony of attempted robbery with a dangerous weapon.

(Emphasis added.)

The trial court repeated this instruction when it listed the sixth element of the offense of first-degree burglary:

> and sixth, that at the time of the breaking and entering the defendant intended to commit either the felony of first degree— attempted first degree rape, attempted first degree sexual offense, *attempted larceny* or attempted robbery with a dangerous weapon.

(Emphasis added.)

The trial court then, for the third time, told the jury that defendant could be found guilty of first-degree burglary if he acted with the intent to commit attempted larceny.

> So I charge that if you find from the evidence and beyond a reasonable doubt that on or about the alleged date the defendant broke and entered an occupied dwelling house without the owner's consent, during the nighttime, and that at that time the

defendant intended to commit either attempted first degree rape, attempted first degree sexual offense, *attempted larceny* or attempted robbery with a dangerous weapon, it would be your duty to return a verdict of guilty of first degree burglary.

(Emphasis added.)

In this case, defendant was charged with attempted larceny, attempted first-degree rape, and attempted first-degree sexual offense, in addition to the first-degree burglary and murder charges. As to the burglary charge, the trial court should have instructed that if defendant had the intent to commit a rape, sexual offense, or *larceny* at the time of the breaking and entering, then he should be convicted of first-degree burglary. The crime of first-degree burglary is "complete when an occupied dwelling is broken and entered in the nighttime with the intent to commit larceny therein, whether or not anything was actually stolen from the house." *State v. Coffey*, 289 N.C. 431, 437-38, 222 S.E.2d 217, 221 (1976).

At the conclusion of the trial court's instructions, the prosecutor suggested that they might have been erroneous. The trial court then told the jury that it was going to correct that error and gave the jury supplemental instructions, *inter alia*, on the elements of first-degree burglary. During the supplemental instructions, the trial court replaced the phrase "attempted larceny" with the word "larceny" in describing the intent element of first-degree burglary. Defendant argues, nevertheless, that the effect of the supplemental instructions was to leave the jury with the impression that attempted larceny and larceny had the same definition. Therefore, defendant contends the jury convicted him of attempted larceny and first-degree burglary "with intent to commit larceny."

Defendant did not object to the trial court's instructions on first-degree burglary at trial. Therefore, our review is limited to a review for plain error. *State v. Odom*, 307 N.C. 655, 659-60, 300 S.E.2d 375, 378 (1983). To constitute plain error, an error in the trial court's instruction must be "so fundamental as to amount to a miscarriage of justice or . . . probably resulted in the jury reaching a different verdict than it otherwise would have reached." *State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988).

A charge must be construed contextually, and isolated portions of it will not be held prejudicial when the charge as a whole is cor-

rect. *State v. Cook,* 263 N.C. 730, 140 S.E.2d 305 (1965); *State v. Goldberg,* 261 N.C. 181, 134 S.E.2d 334 (1964); *State v. Taft,* 256 N.C. 441, 124 S.E.2d 169 (1962). If the charge as a whole presents the law fairly and clearly to the jury, the fact that isolated expressions, standing alone, might be considered erroneous will afford no ground for a reversal. *State v. Hall,* 267 N.C. 90, 147 S.E.2d 548 (1966). Furthermore, insubstantial technical errors which could not have affected the result will not be held prejudicial. *State v. Norris,* 242 N.C. 47, 86 S.E.2d 916 (1955). The judge's words may not be detached from the context and the incidents of the trial and then critically examined for an interpretation from which erroneous expressions may be inferred.

*State v. McWilliams,* 277 N.C. 680, 684-85, 178 S.E.2d 476, 479 (1971).

In viewing the charge as a whole, we conclude that the erroneous inclusion of the word "attempted" in the original burglary instruction was not plain error. First, the trial court's supplemental instructions and the verdict sheet state that for the jury to return a verdict of "guilty," defendant must have intended to commit larceny, a correct statement of the law. Second, the crucial element in burglary is the intent to commit a larceny, which is the identical intent necessary to commit an attempted larceny. In the original instruction, the trial court correctly defined the intent required for both larceny and attempted larceny, and the instructions make it clear that the intent required is the same. Third, the jurors convicted defendant of the separate charge of attempted larceny, which means they concluded beyond a reasonable doubt that defendant intended to commit a larceny. The fact that defendant left the house without taking anything is irrelevant because the actual commission of the intended felony is not essential to the crime of burglary. *See State v. Worsley,* 336 N.C. 268, 279-81, 443 S.E.2d 68, 73 (1994).

Finally, based on the evidence submitted at trial, there could be no plain error by the inclusion of the word "attempted" in the original burglary instruction. The State presented evidence that there was a breaking and entering of an occupied dwelling at nighttime. In the absence of evidence of another intent or explanation for breaking and entering, the usual object or purpose of burglarizing a dwelling house at night is theft. *State v. Hedrick,* 289 N.C. 232, 236, 221 S.E.2d 350, 353 (1976). In this case, defendant testified that he intended to steal marijuana when he broke into and entered the victim's home. Thus,

there was direct evidence presented at trial of defendant's intent to commit larceny sufficient to support the burglary conviction and no evidence to the contrary. Accordingly, this assignment of error is overruled.

Defendant next contends that because the original jury instruction on burglary erroneously contained the phrase "attempted larceny," the subsequent conviction for felony murder based on the burglary must be vacated. The instruction given to the jury on felony murder was correct, and as we have previously explained, the inclusion of the word "attempted" in the original burglary instruction neither factually nor legally changed the elements of burglary. In any event, any error was corrected by the supplemental instructions. Defendant's conviction for first-degree murder based on the underlying felony of burglary was without error, and this assignment of error is overruled.

[3] By another assignment of error, defendant contends that his conviction for attempted larceny must be vacated because the indictment for attempted larceny did not specify the property defendant attempted to steal. Defendant mistakenly relies upon the case of *State v. Ingram*, 271 N.C. 538, 157 S.E.2d 119 (1967), which held that an indictment for felonious larceny was fatally defective because the description of the stolen property "by generally and broadly comprehensive words" was not sufficient to enable the jury to say that the specific article proved to be stolen was the same as that alleged in the indictment. It is not necessary in an *attempted* larceny indictment, however, to specify the particular goods and chattels the defendant intended to steal. *State v. Utley*, 82 N.C. 556 (1880). The offense of *attempted* larceny is complete where there is a general intent to steal and an act in furtherance thereof, and it is "equally a public injury, whether the attempt was with a general intent to steal, or upon a particular intent." *Id.* at 558. In *Utley*, the defendant was indicted for "an attempt to steal, take and carry away from the dwelling house of John J. Norris the goods and chattels and moneys of the said Norris in said house contained," and this Court held that the indictment was legally sufficient. *Id.* at 558-59. In doing so, we concluded that it is not necessary in a bill of indictment for attempted larceny "to aver the specific articles intended to be taken, as such fact is extrinsic and not essential to constitute a criminal attempt." *Id.* at 560.

[4] Defendant raises several assignments of error relating to the submission of the pecuniary gain aggravating circumstance to the jury

during his capital sentencing proceeding. N.C.G.S. § 15A-2000(e)(6) (Supp. 1995). By one such assignment, defendant contends that the pattern jury instruction on pecuniary gain is vague and overly broad. This Court has previously concluded that submitting the aggravating circumstance of pecuniary gain is constitutional where the pattern instruction was used. *State v. Oliver*, 309 N.C. 326, 307 S.E.2d 304 (1983) (*"Oliver II"*). This assignment of error is overruled.

**[5]** By another assignment of error, defendant contends that the trial court erred in submitting the pecuniary gain aggravating circumstance after the jury had failed to find defendant guilty of first-degree murder on the theory that he killed after premeditation and deliberation. Defendant argues that if he did not possess the *mens rea* to commit premeditated and deliberated murder, then he also could not have had the requisite state of mind to kill for pecuniary gain. We disagree.

"The gravamen of the pecuniary gain aggravating circumstance is that 'the killing was for the purpose of getting money or something of value.'" *State v. Jennings*, 333 N.C. 579, 621, 430 S.E.2d 188, 210 (quoting *State v. Gardner*, 311 N.C. 489, 513, 319 S.E.2d 591, 606 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985)), *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 602 (1993). Pecuniary gain should be found where "the hope of pecuniary gain provided the impetus for the murder." *State v. Oliver*, 302 N.C. 28, 62, 274 S.E.2d 183, 204 (1981) (*"Oliver I"*).

In *Oliver I*, the defendants, who were convicted on the felony murder theory with armed robbery as the underlying felony, contended that the trial court erred in submitting pecuniary gain as an aggravating circumstance. This Court stated that the pecuniary gain circumstance examines the motive of the defendant. "While his motive does not constitute an element of the offense, it is appropriate for it to be considered on the question of his sentence." *Id.*

The State's evidence in this case was that defendant's motive for breaking and entering Mrs. Poore's house was to steal. Defendant testified that he went to Mrs. Poore's house to steal marijuana. Jeffrey Kyle Wilson, a fellow inmate, testified that defendant told him he was going to steal Mrs. Poore's purse, but after he killed her, he could not find it. Although a jury could find from such evidence that defendant did not intend to kill the victim when he struck her, it also could find that defendant's motive in striking her was pecuniary gain. This assignment of error is overruled.

**[6]** By another assignment of error, defendant contends that the trial court erred in instructing the jury that it could find the pecuniary gain aggravating circumstance without finding that defendant acted with the motive of pecuniary gain. Defendant argues that this is so because the evidence showed that defendant's motive for breaking and entering Mrs. Poore's house was for drugs that he could use to satisfy his drug dependency, not for money or property that he could convert to money. Consequently, he says the jury should have been instructed that it could find the pecuniary gain circumstance if it found that he intended or expected to obtain money or some other thing which *the defendant* valued in money. We find defendant's argument unpersuasive.

The State's evidence showed that defendant broke into and entered Mrs. Poore's house with the intent to steal. Absent evidence to the contrary, a usual object or purpose of burglarizing a dwelling house at night is presumed to be theft. *Hedrick*, 289 N.C. at 236, 221 S.E.2d at 353. Whether defendant was looking for marijuana or for Mrs. Poore's purse is not relevant. As there was no evidence that the burglary was motivated by some impulse other than pecuniary gain, the evidence in this case was sufficient to support a finding of the pecuniary gain aggravating circumstance. This assignment of error is overruled.

**[7]** Finally, defendant contends that the trial court erred in submitting the pecuniary gain circumstance to aggravate a felony murder conviction where burglary is the underlying felony. Defendant argues that he was convicted of first-degree burglary on the basis of his intent to commit larceny. He says that because larceny is an element of burglary, pecuniary gain is also an element of burglary, and this Court has held that an element of the felony used to support a felony murder conviction cannot also be used as an aggravator.

We have consistently upheld the submission of the pecuniary gain aggravating circumstance for purposes of sentencing a defendant convicted of felony murder with robbery as the underlying felony. *State v. Quesinberry*, 319 N.C. 228, 354 S.E.2d 446; *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983); *State v. Taylor*, 304 N.C. 249, 283 S.E.2d 761 (1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398 (1983); *State v. Irwin*, 304 N.C. 93, 282 S.E.2d 439 (1981); *Oliver I*, 302 N.C. 28, 274 S.E.2d 183. We find these cases dispositive of the issue of whether submission of the pecuniary gain aggravating circumstance is proper in a burglary-felony murder case.

STATE v. CHANDLER

[342 N.C. 742 (1996)]

In *Oliver I* and its progeny, we stated that

> robbery constitutes an essential element of felony murder. In a capital case tried solely on a felony murder theory[,] a jury, in the absence of this element, could not find defendant guilty of the capital offense. The circumstance that the capital felony was committed for pecuniary gain, however, is not such an essential element. This circumstance examines the motive of the defendant rather than his acts. While his motive does not constitute an element of the offense, it is appropriate for it to be considered on the question of his sentence.

302 N.C. at 62, 274 S.E.2d at 204 (footnote omitted). This same reasoning applies to felony murder where burglary is the underlying felony. Burglary is an essential element of felony murder. Pecuniary gain is not such an essential element. Thus, the pecuniary gain aggravating circumstance was properly submitted to the jury. This assignment of error is overruled.

[8] By another assignment of error, defendant contends that the trial court erred by failing to submit the statutory mitigating circumstance that the defendant was under the influence of a mental or emotional disturbance when he committed the crime. N.C.G.S. § 15A-2000(f)(2). Defendant argues that there was substantial evidence from which a reasonable juror could have found this circumstance to exist. Defendant's evidence tended to show that he was in a panicked state when he struck Mrs. Poore and that he was suffering from mixed personality disorder and substance abuse disorder.

A trial court is not required to submit a mitigating circumstance to the jury unless it is supported by substantial evidence. *State v. Miller*, 339 N.C. 663, 455 S.E.2d 137, *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 169 (1995). Here, the evidence did not support defendant's contention that he was under a mental or emotional disturbance at the time of the murder. The only witness called to testify in support of any claim of mental or emotional impairment was Dr. John Warren, a clinical psychologist. Dr. Warren testified that defendant suffers from substance abuse disorder including the substances of alcohol and marijuana primarily, and LSD occasionally. He opined that in such individuals alcohol abuse blocks out controls or inhibitions. He testified that defendant told him that he had been drinking fortified wine on the night in question. Dr. Warren also testified that defendant suffered from mixed personality disorder with immature, impulsive,

STATE v. CHANDLER

[342 N.C. 742 (1996)]

antisocial, and emotionally unstable features that, among other things, made the defendant more impulsive than a normal person.

However, on cross-examination, Dr. Warren testified that defendant has an average-range IQ and that he was competent to stand trial. He also testified that he did not have any independent corroboration to the effects of any alcohol that defendant allegedly consumed on the night in question other than what he had been told by the defendant—a defendant who had also denied having any involvement in the murder during Dr. Warren's examination of him six months prior to trial. Moreover, Dr. Warren did not testify about the specific effects, if any, that alcohol may have on a person diagnosed with mixed personality disorder.

Assuming *arguendo* that defendant was under the influence of fortified wine at the time he committed the murder, in *State v. Irwin*, 304 N.C. at 105-06, 282 S.E.2d at 447-48, we held that voluntary intoxication by alcohol or drugs at the time of the commission of a murder does not qualify as a mental or emotional disturbance under the statute. *See also State v. Greene*, 329 N.C. 771, 775, 408 S.E.2d 185, 186 (1991). Thus, defendant's alleged voluntary alcohol use on the night in question does not qualify as a mental or emotional disturbance for purposes of N.C.G.S. § 15A-2000(f)(2). This assignment of error is overruled.

Defendant next contends that the trial court erred by not intervening during the prosecutors' closing arguments to the jury. He brings forward numerous assignments of error in which he argues that (1) the prosecutors improperly urged the jury to vote for the death penalty to deter the violence and crime that plague our society; (2) the prosecutors improperly encouraged the jury to draw negative inferences from defendant's decision not to incriminate himself or to give a statement to the police prior to testifying on his own behalf; and (3) the prosecutors improperly criticized the capital punishment statute, thereby discouraging the jury from following the law as it is obligated to do. Further, defendant argues that the prosecutors' arguments did not rely upon matters contained within the record; instead, they relied upon an appeal to the jury's sense of civic commitment to protect all of society.

As a general rule, prosecutors are granted wide latitude in the scope of their closing argument to the jury at sentencing and may argue the law and facts in evidence and all reasonable inferences drawn therefrom. *State v. Garner*, 340 N.C. 573, 459 S.E.2d 718

(1995). Moreover, "[o]n appeal; particular prosecutorial arguments are not viewed in an isolated vacuum." *State v. Moseley*, 338 N.C. 1, 50, 449 S.E.2d 412, 442 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 738 (1995). "Fair consideration must be given to the context in which the remarks were made and to the overall factual circumstances to which they referred." *Id.*

[9] First, defendant contends that one of the prosecutors blatantly and unconstitutionally urged the jury to vote for the death penalty to deter crime. Despite failing to object during the prosecutor's argument, defendant now challenges the following comments:

> When are we going to care about the rights of the victim? We all care about the rights of the accused. That's what this whole system is about in this room is the right of the accused, a human being, before we deprive him of that sweet air.
>
> . . . .
>
> . . . By inaction the fire has gone out. It's cold. Don't let that happen in this country. Don't let the fire go out. Don't let the moral fiber and conscience of this country go out. Don't let that be the fate of this country, the fate of people like Mrs. Poore that live in the City of Mount Airy, as you've seen in that aerial photograph. Don't let it go. Make the choice.

"[O]ur appellate courts may, in the absence of an objection by the defendant, review a prosecutor's argument to determine whether the argument was so grossly improper that the trial court committed reversible error in failing to intervene *ex mero motu* to correct the error." *State v. Williams*, 317 N.C. at 482, 346 S.E.2d at 410. A prosecutor is permitted to emphasize the responsibility of the jurors and even describe them as the voice of the community. *State v. Jones*, 336 N.C. 229, 443 S.E.2d 48, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 423 (1994). Defendant has failed to show how the prosecutor's argument was improper. Certainly it did not amount to "gross impropriety."

[10] Defendant also challenges the following comments by one of the prosecutors, to which his objection was overruled, which he argues improperly appealed to the jury's sense of civic commitment to protect all of society and did not rely upon matters contained within the record:

> Because if we don't have law you may be sitting over with that family one day or sitting where there's family, and you may be sit-

ting and looking at 12 jurors and hoping that those jurors know that they are the last hope that our society has. If we can't stop the Frank Chandlers of the world, if we can't stop the men of the night—

This Court has previously held that a prosecutor may argue for the death penalty because of its deterrent effect on the defendant personally. *State v. Johnson*, 298 N.C. 355, 259 S.E.2d 752 (1979). Defendant's argument is without merit.

Defendant also challenges comments by another prosecutor which he argues sought to convince the jury that by failing to tell his version of what happened on the night of the crime until he testified, defendant was seeking an unfair tactical advantage and, therefore, should not be viewed as remorseful. A prosecutor is permitted to argue the law and the facts in evidence and all reasonable inferences that may be drawn therefrom. *State v. Huffstetler*, 312 N.C. 92, 322 S.E.2d 110 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985). Based on the evidence in this case, we find the prosecutor's comments regarding defendant's insincerity to be permissible inferences from the evidence.

[11] Finally, defendant contends that the prosecutors at several points criticized the whole basis of our capital punishment statute. For example, defendant argues that a prosecutor criticized the legislature for providing only one aggravating circumstance.

One aggravating circumstance. That's a choice right there. Out of the 11 aggravating circumstances that North Carolina provides for when a man goes into a woman's house such as this woman and kills a 90-year-old woman the North Carolina Legislature decided that you would have just one choice, one aggravating factor under the law. I find that interesting.

Because defendant did not object to any of the statements, we review them to determine whether the arguments complained of were "so prejudicial and grossly improper as to require corrective action by the trial [court] *ex mero motu*." *State v. James*, 322 N.C. 320, 324, 367 S.E.2d 669, 672 (1988). Read in context, we hold that none of the prosecutors' statements complained of by defendant were so grossly improper that the trial court should have intervened *ex mero motu*. These assignments of error are overruled.

Defendant raises four additional issues that have been decided contrary to his position by this Court. He raises these issues for the

purpose of preserving them for any possible further judicial review of this case. We have carefully considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Therefore, we overrule these assignments of error.

Having concluded that defendant's trial and separate capital sentencing proceeding were free from prejudicial error, we turn to the duties reserved by N.C.G.S. § 15A-2000(d)(2) exclusively for this Court in capital cases. It is our duty in this regard to ascertain (1) whether the record supports the jury's findings of the aggravating circumstances on which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or other arbitrary consideration; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant. N.C.G.S. § 15A-2000(d)(2). After thoroughly examining the record, transcripts, and briefs in the present case, we conclude that the record fully supports the aggravating circumstance found by the jury. Further, we find no indication that the sentence of death in this case was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We must turn then to our final statutory duty of proportionality review.

[12] In the present case, defendant was convicted of first-degree murder under the felony murder rule, with first-degree burglary as the underlying felony. The jury found as the sole aggravating circumstance that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6). The jury found as mitigating circumstances that (1) defendant's parents did not provide proper role models for him during his formative years, (2) defendant had a history of alcohol and drug abuse which has led him to make poor choices in his life, and (3) defendant acknowledged his guilt in open court to the charges of murder and burglary.

In our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. State v. McCollum, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), cert. denied, —— U.S. ——, 129 L. Ed. 2d 895 (1994). We do not find this case substantially similar to any case in which this Court has found the death penalty disproportionate and entered a sentence of life imprisonment. Each of those cases is distinguishable from the present case.

In *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), the defendant was convicted of first-degree murder based on the theory of felony murder, with pecuniary gain as the only aggravating circumstance. The jury found several mitigating circumstances, including that defendant was under the influence of mental or emotional disturbance at the time of the crime. By contrast, in this case the mental or emotional disturbance mitigator was not even submitted for the jury's consideration. Further, the brutality of this crime substantially outweighs that of the crime in *Benson*. The defendant there shot the victim's legs; defendant here struck the victim in the head with such force as to break her skull in two.

In *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987), the defendant was one of four individuals who was involved in the beating death of a robbery victim. Again, the defendant was found guilty of felony murder, and only one aggravating circumstance was found, that the crime was especially heinous, atrocious, or cruel. The Court, in finding that the death sentence was disproportionate, noted that none of the defendant's accomplices were sentenced to death, although they "committed the same crime in the same manner." *Id.* at 27, 352 S.E.2d at 664. In addition, the Court deemed it important that the defendant was only seventeen. The jury found, in contrast to the present case, that defendant suffered from impaired capacity to appreciate the criminality of his conduct, that he was under the influence of a mental or emotional disturbance at the time of the murder, and that his age at the time of the crime had mitigating value.

In *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988), the defendant was convicted of first-degree murder for mistakenly shooting the victim in a parking lot during an argument with the victim's friend. The only aggravating circumstance found was that the murder was part of a course of conduct which included the commission by the defendant of other crimes of violence against another person or persons. The Court found that the "seemingly senseless shooting simply did not contain the viciousness and the cruelty present" in other death cases that involved only the "course of conduct" aggravating circumstance. *Id.* at 234, 341 S.E.2d at 731.

In *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985), the defendant, after drinking all day, stabbed and robbed a man. This Court concentrated on the fact that the defendant had been drinking heavily all day and wanted to kill the victim to buy more liquor.

**STATE v. CHANDLER**

[342 N.C. 742 (1996)]

In *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984), the evidence was speculative as to how the murder occurred or how defendant acted when he encountered the victim, who was a law enforcement officer. This Court emphasized the "unqualified cooperation" of the defendant during the investigation.

In *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983), the defendant shot his victim after the defendant had spent the night drinking. There was no motive for the killing, and immediately after the victim was shot, the defendant sought medical help for the victim.

In *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703, the victim was shot twice in the head. The defendant had flagged down the victim's car earlier, telling his companions that he intended to rob the victim. This Court found the death sentence disproportionate because there was "no evidence of what occurred after defendant left with the victim." *Id.* at 46, 305 S.E.2d at 717. Here, the defendant admitted at trial that he killed Mrs. Poore.

We conclude that this case is not similar to any of the above cases where the death sentence was found to be disproportionate. In this case, defendant admitted at trial that he killed Mrs. Poore, and the jury specifically rejected the three statutory mitigating circumstances submitted: that defendant suffered from impaired capacity to appreciate the criminality of his conduct, that his age at the time of the crime had mitigating value, and that defendant had no significant history of prior criminal activity.

Defendant, in this case, broke into and entered the home of an elderly woman who lived alone, seeking either marijuana or money. Based on defendant's testimony, if believed, as he walked through the house, he heard Mrs. Poore. Upon hearing her, he struck her in the head with such force as to break her skull in two. Thereafter, he carried her to her bed and wiped his bloody hands on her stomach. He then removed her pajama bottoms and underpants. He told his cellmate Jeffrey Kyle Wilson that he did this because he wanted to see what an old woman's "pussy" looked like. He then covered her up and proceeded to search the house for her purse. Unable to find it, he left the house and returned to his aunt's house and went to sleep. Defendant never attempted to seek medical attention for Mrs. Poore after he struck her, but instead left her in her bed in a pool of blood to die.

**STATE v. CHANDLER**

[342 N.C. 742 (1996)]

After the murder, defendant immediately began a failed attempt to establish an alibi. He lied to the police. He tried to convince his cousin to lie to the police and to say that he never left the house on the morning of the murder. He also tried to destroy his fingerprint cards after the police obtained them. He told Wilson that he would try to avoid conviction and would "play crazy." Defendant's lack of remorse is evident.

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although we have repeatedly stated that we review all of the cases in the pool when engaging in this statutory duty, it is worth noting again that "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* It suffices to say here that we conclude the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or those in which juries have consistently returned recommendations of life imprisonment.

The fact that Mrs. Poore was killed in her home at night is also significant. As this Court has consistently stated,

> [t]he sanctity of the home is a revered tenet of Anglo-American jurisprudence. *See, e.g., Segura v. United States*, 468 U.S 796, 810, 82 L. Ed. 2d 599, 612 (1984) ("The sanctity of the home is not to be disputed."). The law recognizes the special status of the home, giving one the right to defend it. "A man's house, however humble, is his castle, and his castle he is entitled to protect against invasion . . . ." *State v. Gray*, 162 N.C. 608, 613, 77 S.E. 833, 835 (1913), quoting I Wharton's Criminal Law, sec. 503 (9th ed.), and citing 1 J. Bishop, *New Criminal Law*, sec. 858 and 1 Hale, *Pleas of the Crown*, sec. 458. And the law has consistently acknowledged the expectation of and right to privacy within the home. *See, e.g., Segura v. United States*, 468 U.S. at 820, 82 L. Ed. 2d at 619 (Stevens, J., dissenting) ("Nowhere are expectations of privacy greater than in the home."). This crime shocks the conscience, not only because a life was senselessly taken, but because it was taken by the surreptitious invasion of an especially private place, one in which a person has a right to feel secure.

*State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987).

Under North Carolina's system for administering capital punishment as mandated by our legislature, the appropriateness of the sentence of death is for the jury to decide. N.C.G.S. § 15A-2000 (1988). Although this Court is required to conduct the function of proportionality review, we are not authorized to substitute our own notions as to the appropriateness of the penalty of death in a given case for those of the jury. Therefore, only in the most clear and extraordinary situations may we properly declare a sentence of death which has been recommended by the jury and ordered by the trial court to be disproportionate. *See generally State v. Williams*, 308 N.C. 47, 301 S.E.2d 335, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983). This is not such a case. Accordingly, we conclude that the sentence of death recommended by the jury and ordered by the trial court in the present case is not disproportionate.

For the foregoing reasons, we hold that the defendant received a fair trial, free of prejudicial error, and that the sentence of death entered in the present case must be and is left undisturbed.

NO ERROR.

Justice ORR dissenting.

I respectfully dissent from the majority opinion on two grounds. First, the trial court erred in submitting the (e)(6) aggravating circumstance—that the capital felony was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6) (Supp. 1995)—and second, the death sentence is disproportionate.

In 1977, the North Carolina General Assembly passed a new capital punishment statute, N.C.G.S. § 15A-2000, modeled in large part on the American Law Institute's Model Penal Code § 210.6. *See State v. Johnson*, 298 N.C. 47, 56-63, 257 S.E.2d 597, 606-10 (1979) (reviewing the history leading to the enactment of N.C.G.S. § 15A-2000). Under this new legislation, a defendant convicted of a capital felony is subjected to a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment. N.C.G.S. § 15A-2000(a)(1). The heart of the death penalty statute is the requirement that a death sentence cannot be imposed absent a finding of at least one aggravating circumstance of the eleven possible aggravating circumstances set out in the statute. N.C.G.S. § 15A-2000(d)(2); *see* Geoffrey Carlyle Mangum, Comment, *Vague*

**STATE v. CHANDLER**

[342 N.C. 742 (1996)]

*and Overlapping Guidelines: A Study of North Carolina's Capital Sentencing Statute,* 16 Wake Forest L. Rev. 765, 777 (1980).

Generally, the critical function of aggravating circumstances in any capital punishment scheme is to identify those circumstances that distinguish killings resulting in first-degree murder convictions warranting the punishment of death from those that do not. *See Lowenfield v. Phelps,* 484 U.S. 231, 244, 98 L. Ed. 2d 568, 581-82 (1988) ("The use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion."); *Gregg v. Georgia,* 428 U.S. 153, 197-98, 49 L. Ed. 2d 859, 888 (1976) (The aggravating circumstances require the jury to consider "the circumstances of the crime or the character of the defendant" before it recommends sentence.). Thus, an "aggravating circumstance" is just that—"a fact or group of facts which tend to make a specific murder particularly deserving of the death penalty." N.C.P.I.—Crim. 150.10 (1995); *see State v. Hutchins,* 303 N.C. 321, 351, 279 S.E.2d 788, 806 (1981); *Black's Law Dictionary* 60 (rev. 5th ed. 1979) (defining "aggravation" as "[a]ny circumstance attending the commission of a crime . . . which increases its guilt or enormity . . . , but which is above and beyond the essential constituents of the crime"). The eleven aggravating circumstances listed in N.C.G.S. § 15A-2000(e) fit neatly within that concept:

(1) The capital felony was committed by a person lawfully incarcerated.

(2) The defendant had been previously convicted of another capital felony or had been previously adjudicated delinquent in a juvenile proceeding for committing an offense that would be a capital felony if committed by an adult.

(3) The defendant had been previously convicted of a felony involving the use or threat of violence to the person or had been previously adjudicated delinquent in a juvenile proceeding for committing an offense that would be a Class A, B1, B2, C, D, or E felony involving the use or threat of violence to the person if the offense had been committed by an adult.

(4) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

STATE v. CHANDLER

[342 N.C. 742 (1996)]

(5) The capital felony was committed while the defendant was engaged, or was an aider or abettor, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any homicide, robbery, rape or a sex offense, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb.

(6) The capital felony was committed for pecuniary gain.

(7) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.

(8) The capital felony was committed against a law-enforcement officer, employee of the Department of Correction, jailer, fireman, judge or justice, former judge or justice, prosecutor or former prosecutor, juror or former juror, or witness or former witness against the defendant, while engaged in the performance of his official duties or because of the exercise of his official duty.

(9) The capital felony was especially heinous, atrocious, or cruel.

(10) The defendant knowingly created a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person.

(11) The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons.

N.C.G.S. § 15A-2000(e).

In the interpretation and construction of statutes, it is the responsibility of the reviewing court to attempt to determine the legislative intent. *See State v. Lucas*, 302 N.C. 342, 345, 275 S.E.2d 433, 435 (1981). The Fair Sentencing Act, enacted in 1979, was amended in 1981 and contained an aggravating factor that "[t]he offense was committed for hire or pecuniary gain." N.C.G.S. § 15A-1340.4(1)(c) (Supp. 1981). In 1983, the legislature again amended N.C.G.S. § 15A-1340.4(a)(1)(c), Act of Oct. 1, 1983, ch. 70, secs. 1-2, 1983 N.C.

Sess. Laws 43 (entitled "An Act To *Clarify* The Aggravating Factor Regarding Pecuniary Gain Under The Fair Sentencing Act") (emphasis added), "clarifying" the aggravating factor "that the offense was committed for hire or *pecuniary gain*" and stated that it meant "defendant was hired or *paid to commit the crime.*" N.C.G.S. § 15A-1340.4(a)(1)(c) (emphasis added); *see State v. Abdullah*, 309 N.C. 63, 76, 306 S.E.2d 100, 108 (1983); *State v. Thompson*, 64 N.C. App. 354, 355, 307 S.E.2d 397, 398 (1983); *State v. Thompson*, 62 N.C. App. 585, 586, 303 S.E.2d 85, 86 (1983); *see also State v. Thompson*, 60 N.C. App. 679, 684, 300 S.E.2d 29, 32 (held error to submit (a)(1)(c) aggravating factor when only evidence of pecuniary gain was that the defendant broke into the building with the intention of taking copper), *modified and aff'd*, 309 N.C. 421, 307 S.E.2d 156 (1983). Thus, in my opinion, the 1983 amendment to paragraph (a)(1)(c) of the Fair Sentencing Act clarifying the scope of "pecuniary gain" evinces the legislature's intent to avoid enhancement of a sentence simply because money or other valuable items are involved in the crime. However, this Court in *State v. Gardner*, 311 N.C. 489, 513, 319 S.E.2d 591, 606 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985), relying on an earlier interpretation in *State v. Oliver*, 302 N.C. 28, 274 S.E.2d 183 (1981), of the (e)(6) aggravating circumstance rejected the argument that, in the capital punishment statute, "for pecuniary gain" meant that a defendant had to be hired or paid to commit the murder. The Court based its decision in part on the fact that the legislature had failed to "clarify" the capital punishment statute and had only done so on the "pecuniary gain" aggravating factor under the Fair Sentencing Act.

Having rejected in *Gardner* what would appear to be a logical limitation of the (e)(6) aggravating circumstance, this Court has over the years broadened the circumstances under which the (e)(6) aggravating circumstance is deemed correctly applied. In *State v. Jennings*, this Court said: .

The gravamen of the pecuniary gain aggravating circumstance is that "the killing was for the purpose of getting money or something of value." [*Gardner*, 311 N.C. at 513, 319 S.E.2d at 606]; *see also* [*Oliver*, 302 N.C. at 62, 274 S.E.2d at 204]("[t]he hope of pecuniary gain provided the impetus for the murder"). This financial motivation or impetus "aggravates" the murder, distinguishing the murder from other murders as being more egregious and therefore more worthy of the extreme sanction of death.

*State v. Jennings*, 333 N.C. 579, 621-22, 430 S.E.2d 188, 210, *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 602 (1993). As noted in *Oliver*, the pecuniary gain aggravating circumstance "examines the *motive* of the defendant rather than his acts." *Oliver*, 302 N.C. at 62, 274 S.E.2d at 204 (emphasis added).

Although well aware of the necessity to follow precedent even when disagreeing with the earlier reasoning of the Court, the majority opinion now broadens even further the interpretation and application of the (e)(6) "pecuniary gain" aggravating circumstance. As such, I find the application is neither supported by case law nor a sound extension of the purpose of aggravating circumstances.

In reviewing the evidence in this case, the sum total of all the evidence relating to pecuniary gain is (1) that defendant broke into Mrs. Poore's house seeking to steal marijuana, and (2) that a fellow inmate and one of the investigating officers testified that defendant told them that before leaving the house after the murder, defendant "looked for" Mrs. Poore's pocketbook but never saw it. I note that the statement in the majority opinion that defendant "was going to steal Mrs. Poore's purse, but after he killed her, he could not find it" is not supported by the record. It is uncontradicted, however, that nothing was stolen by the defendant either before the murder or afterwards. With respect to the killing itself, the evidence is also uncontradicted that there was a surprise encounter between defendant and Mrs. Poore in the darkened house and that defendant turned in surprise and struck Mrs. Poore with one fatal blow of his hand to her head. It is particularly noteworthy that the jury did *not* convict defendant of premeditated and deliberate first-degree murder, indicating that the jury believed defendant's testimony that he did not intend to kill Mrs. Poore. The jury instead convicted him under the felony murder theory, the underlying felony being the burglary of Mrs. Poore's house.

If we are to rely on the test established in *Oliver*, then there must be *some* evidence that the *motive* for the killing was pecuniary gain. There simply is no such evidence in this case. While defendant clearly had a pecuniary gain motive for breaking into Mrs. Poore's house, it is only unsupported speculation that the actual killing had anything to do with seeking pecuniary gain. The facts here are totally opposite from circumstances where, for example, a defendant is paid to commit murder, commits murder in order to collect insurance proceeds, or shoots a store clerk who refuses to open a cash register. Under

those types of circumstances, evidence clearly exists that the defendant's motive for the killing was pecuniary gain.

Where the majority opinion now leaves the state of the law is that as long as there is some pecuniary gain motive present in the attendant circumstances surrounding a capital felony, a defendant, even one convicted of felony murder but not first-degree murder based on premeditation and deliberation, will be subject to the imposition of the death penalty. This extension of the application of the (e)(6) aggravating circumstance also directly relates to my disagreement with the majority's finding of proportionality in this case. The following capital felony decisions rendered by this Court in 1995 alone, include defendants who were found guilty of first-degree murder based on premeditation and deliberation—many based on premeditation and deliberation *and* felony murder or involving murderous acts far more egregious than those found in the instant case—and yet were either:

(1) not tried capitally, *State v. Holt*, 342 N.C. 395, 464 S.E.2d 672 (1995) (victim shot as he fled); *State v. Pleasant*, 342 N.C. 366, 464 S.E.2d 284 (1995) (father dies from multiple gunshot wounds); *State v. King*, 342 N.C. 357, 464 S.E.2d 288 (1995) (victim shot in the head for stealing drug money); *State v. Gibson*, 342 N.C. 142, 463 S.E.2d 193 (1995) (victim died from multiple gunshot wounds during fight over his girlfriend); *State v. Burke*, 342 N.C. 113, 463 S.E.2d 212 (1995) (victim died from multiple gunshot wounds); *State v. Butler*, 341 N.C. 686, 462 S.E.2d 485 (1995) (victim stabbed to death in his home); *State v. Goodson*, 341 N.C. 619, 461 S.E.2d 740 (1995) (wife killed by gunshot wound to the head); *State v. Cannon*, 341 N.C. 79, 459 S.E.2d 238 (1995) (wife shot and killed during domestic dispute); *State v. Wilson*, 340 N.C. 720, 459 S.E.2d 192 (1995) (teenage boy stabbed while sitting in his car); *State v. Riddick*, 340 N.C. 338, 457 S.E.2d 728 (1995) (victim died from single gunshot wound to the neck); *State v. White*, 340 N.C. 264, 457 S.E.2d 841 (mother kills four-year-old child by stuffing plastic bag down her throat), *cert. denied,* —— U.S. ——, 133 L. Ed. 2d 436 (1995); *State v. Truesdale*, 340 N.C. 229, 456 S.E.2d 299 (1995) (victim died from multiple gunshot wounds from behind); *State v. Solomon*, 340 N.C. 212, 456 S.E.2d 778 (victim died from multiple gunshot wounds), *cert. denied,* —— U.S. ——, 133 L. Ed. 2d 438 (1995); *State v. Alford,* 339 N.C. 562, 453 S.E.2d 512 (1995) (victim shot in the head while sitting in his cousin's car); *State v. Allen*, 339 N.C. 545, 453 S.E.2d 150 (1995) (victim shot during argument); or

(2) a jury declined to impose the death penalty, *State v. Jahn,* 342 N.C. 176, 463 S.E.2d 204 (1995) (victim "pistol whipped" and then shot at point-blank range in the back of the neck); *State v. McCray,* 342 N.C. 123, 463 S.E.2d 176 (1995) (victim died from multiple gunshot wounds); *State v. Ratliff,* 341 N.C. 610, 461 S.E.2d 325 (1995) (victim died from three stab wounds in the chest); *State v. Vick,* 341 N.C. 569, 461 S.E.2d 655 (1995) (two victims killed in their home by gunshots to the head); *State v. Johnson,* 341 N.C. 104, 459 S.E.2d 246 (1995) (wife died from gunshot wounds inflicted while mother held victim in her arms); *State v. Hinson,* 341 N.C. 66, 459 S.E.2d 261 (1995) (victim died from being shot with a crossbow in retaliation for defendant being cheated in a drug deal with a third party); *State v. Hightower,* 340 N.C. 735, 459 S.E.2d 739 (1995) (pregnant girlfriend stabbed thirteen times); *State v. Porter,* 340 N.C. 320, 457 S.E.2d 716 (1995) (defendant killed mother and two other victims by torching mother's mobile home); *State v. Jackson,* 340 N.C. 301, 457 S.E.2d 862 (1995) (victim shot during fight); *State v. Leach,* 340 N.C. 236, 456 S.E.2d 785 (1995) (victim shot in the head while sitting in his car); *State v. House,* 340 N.C. 187, 456 S.E.2d 292 (1995) (victim killed by being dragged behind his truck and then dumped in a creek); *State v. Baity,* 340 N.C. 65, 455 S.E.2d 621 (1995) (victim killed from two gunshot wounds to the chest); *State v. Johnson,* 340 N.C. 32, 455 S.E.2d 644 (1995) (grandparents killed by arson in conspiracy between granddaughter and her boyfriend); *State v. Lovin,* 339 N.C. 695, 454 S.E.2d 229 (1995) (victim shot and stabbed to death in his home by acquaintance); or

(3) a jury was unable to decide on the death penalty, thus requiring the imposition of a mandatory life sentence by the trial court, *State v. Lyons,* 340 N.C. 646, 459 S.E.2d 770 (1995) (police officer shot in the head while executing a search warrant for defendant's apartment); *State v. Knight,* 340 N.C. 531, 459 S.E.2d 481 (1995) (victim stabbed twenty-seven times and then castrated); *State v. Larrimore,* 340 N.C. 119, 456 S.E.2d 789 (1995) (victim shot by hit man hired by the defendant when he opened his front door).

I also note that of the seven other cases decided in 1995 in which the defendants were convicted of felony murder but not first-degree murder based on premeditation and deliberation, six of the defendants were sentenced to a life sentence despite findings of several aggravating circumstances. *E.g., State v. McNatt,* 342 N.C. 173, 463 S.E.2d 76 (1995) (victim killed by blunt trauma as a result of being hit with the butt of a rifle and then kicked and beaten for five minutes

STATE v. CHANDLER

[342 N.C. 742 (1996)]

during robbery); *State v. Lamb*, 342 N.C. 151, 463 S.E.2d 189 (1995) (victim killed by a single gunshot wound to the chest during robbery); *State v. Richardson*, 341 N.C. 658, 462 S.E.2d 492 (1995) (ex-girlfriend's new boyfriend killed by gunshot while sitting in his car); *State v. Grace*, 341 N.C. 640, 461 S.E.2d 330 (1995) (victim died of three gunshot wounds during robbery); *State v. Thibodeaux*, 341 N.C. 53, 459 S.E.2d 501 (1995) (victim died from numerous gunshot wounds during robbery); *State v. McCullers*, 341 N.C. 19, 460 S.E.2d 163 (1995) (victim killed with baseball bat during robbery). In *State v. Powell*, 340 N.C. 674, 459 S.E.2d 219 (1995), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 688 (1996), the only robbery-felony murder case in which pecuniary gain was the sole aggravating circumstance found, the defendant was sentenced to death. However, the facts in *Powell* support a conclusion that the defendant's motive for killing the victim was because he "wanted the money from the cash register." *Id.* at 684, 459 S.E.2d at 223.

With the exception of the last six cases involving felony murder, all of the cases noted involve defendants who were convicted of first-degree murder based, at least in part, on premeditation and deliberation. As indicated, none of these defendants will suffer the death penalty. Defendant, in this case, now faces execution as opposed to a life sentence solely because of the tenuous evidence involving "pecuniary gain."

Mrs. Poore's death is a tragedy, and the circumstances surrounding it are egregious and disturbing. However, in a capital punishment system that is supposed to be proportional and designed to "minimize the risk of wholly arbitrary and capricious action" in imposing the death penalty, *Gregg*, 428 U.S. at 189, 49 L. Ed. 2d at 883, *quoted in Johnson*, 298 N.C. at 59, 257 S.E.2d at 607, I believe that the majority's decision in this case moves us perilously close to a constitutionally infirm application of the (e)(6) aggravating circumstance, and is also in error as to proportionality.

Because I believe that, in this case, the sole aggravating circumstance was improperly submitted and that the sentence imposed is disproportionate, the defendant should be resentenced and a life sentence imposed.